Good morning, your honors. Anthony Dick from Jones Day on behalf of Appellant IBM. If I could, I'd like to reserve five minutes for rebuttal, please. This case illustrates that there is a line between reasonable inference and impermissible speculation. And the jury in this case crossed that line. And the question before the court is whether there was sufficient evidence to support an inference by the jury that any decision maker even knew about any protected opposition activity by Mr. Kingston. And specifically, whether the jury could have inferred that Mr. Kingston had engaged in protected opposition activity by opposing wage theft or unlawful discrimination, and whether any decision maker could have known about that opposition activity. The answer to that question is no, there was not a single piece of evidence that Mr. Kingston himself ever talked to a decision maker, or that any witness had told a decision maker about Mr. Kingston's alleged protected activity. Every witness who was asked the question said no, in fact, no decision maker knew anything about any protected opposition activity. So the only thing that the district court relied on and could rely on was a single email sent on November 14th that supposedly relayed the protected opposition activity to one of the decision makers in the case. But I would implore the court to look at that email, which is at page 73 of the excerpts of record, because the email says nothing about protected opposition activity. It says nothing about discrimination. It says nothing about wage theft. And in fact, it says the exact opposite. It says that Mr. Kingston was okay with the limitation on Mr. Beard's commission. It said that he gets it and he understands that $1.5 million commission was a lot. So there's no way that that email can support a reasonable inference of protected opposition activity when the email said not a word about it. I would urge the court- Before we get to the email, and the email is important, but before that, he complained to several different people. I think it's Larkin and Mitchell and Copeland, who were not the decision makers, but they all talked to the decision makers and they deny having reported this, but the jury doesn't have to believe that denial. And if the jury doesn't believe the denial, why isn't it a reasonable inference given sort of the timing of what happened that they passed along that complaint? Well, yes, Your Honor. As the Washington Court of Appeals said in Michkowski, and as the Eleventh Circuit said in the Clover case, which I was about to get to, the fact that there was an opportunity to tell, or the fact that somebody could have told the decision maker by itself is not a reasonable basis to infer that the decision maker actually was told. That is the difference between a reasonable inference and impermissible speculation. It is not enough to say that the witnesses testified they didn't tell, and we can believe the opposite. It's well established that in the absence of some affirmative testimony, just disbelieving that testimony is not enough. And here there was no person who said, yes, I did tell them. It was purely the absence of evidence. And so there's nothing but speculation, bare speculation, that any person could have been told. That's clearly what the court said in Michkowski. It's clearly what the court said in Clover. And I would urge the court to really look at Michkowski, because the facts of that case are really strongly on point here, because there was an email there that was forwarded to a decision maker. The email didn't say anything about protected activity, although it was about the complaining plaintiff. And what the court said is, you know, we're going to look at the content of the email. We're going to look at what the email says. And if the email itself doesn't say anything about protected activity, the email itself is not a basis to make a reasonable inference that the decision makers were told that. There would have to be something outside of the email, because the email itself says nothing about it. You would need a source of evidence outside of the email, and there wasn't anything in that case. Just as there isn't anything here, there's a lot of smoke and noise, but there's not anything in the email itself, and there's nothing outside of the email that could support such a reasonable inference. And I think that's especially clear if you look at the timeline of the case, because it's undisputed that the investigation of Mr. Kingston was started by Carla Johnson at a time when not only did she not know about any protected activity, but she couldn't have known, because it was before Mr. Kingston says he even engaged in protected activity. So that was the investigation was started at a time when the only inference is that there were real concerns about what Mr. Kingston had done that could not have been rooted in any protected activity. That's when the investigation started. Then the first person who made the decision to recommend termination, and in IBM's internal disciplinary system, this is the most important actor, Linda Kenney, who made the decision to say, I'm going to recommend termination, a very grave decision that she herself recognized was very serious, and weighed the investigatory report, and was an extraordinarily grave and somber decision that she took very seriously. It's undisputed that she did not know anything about Mr. Kingston having engaged in protected activity. I'd urge you to look at excerpts of the record, page five, in the district court's decision, where the district court says that there was no evidence, no evidence that Ms. Kenney knew about any protected activity at the time she recommended the termination. Then after Ms. Kenney recommends that termination, there's another level of review by Russ Mandel, whose job is to review that first termination recommendation for consistency with discipline in other cases. Mr. Mandel looks at that and says it's consistent, and it is undisputed that Mr. Mandel at that time had no knowledge whatsoever of protected activity. And tell me again why Kingston was being terminated, because he what, didn't cap Donato, the white? Not because he didn't cap, not because he didn't cap the commission, but because there was this massive commission that he did not even so much as raise a red flag about. And there was some dispute in the record about what exactly the problem was. Was it that he had retroactively added quota to this, this salesman, or was it that, that, that he had failed to invoke the significant transaction clause or raise some red flags? So I grant you there was some confusion about why there had been concern and what exactly the policy was, but it was very clear that for one reason or another, all of the witnesses at that IBM call thought there was a problem with the commission. That's why the investigation was started in the first place. Again, before it was even logically possible for anybody to have known about Mr. Kingston's protected activity because he hadn't even engaged in it yet on his own account. So it's undisputed that there were serious concerns, whether it was because of the retroactive quota issue, whether it was because of the failure to initiate the significant transactions clause, which by the way, Mr. Kingston himself said in an email, it's very clear that IBM has the authority to adjust a commission in this way. So it was clear that there were concerns independent of any protected activity about the way that Mr. Kingston had handled the commission. And it was those concerns that really drove the decision. If you look at just the way this plays out, the recommendation, the initiation of the investigation, the approval, all of which happened by people who had no knowledge. And by the time it gets to the review board, it's a very careful and thorough process up to that point, which is why, as the record makes clear and as the other side does not dispute, it was 95% of the time that once the recommendation reached their desk, they were going to approve that recommendation. Could you address Kingston's point that under Reeves, if the jury thought that there's some evidence from which the jury could conclude that the stated reason for the termination was pretextual, and if they concluded that, then even in the absence of direct evidence that the decision makers knew about this, that you could infer that that was the reason? Absolutely, Your Honor. Yes. So two points on that. I think first and most importantly, Reeves was not a retaliation case, and therefore, there is no retaliation case that the other side can cite, and we haven't been able to find one. We've looked quite a lot of pretext findings, substituting for knowledge. Why wouldn't the principle be the same? Well, because in your typical discrimination case like Reeves, there's clear knowledge of the protected category. So the prima facie case is not disputed. You knew about the person engaging or having the protected status, or in this case, the protected activity. So in the typical case, you can infer because the decision maker knew about the protected status that you're not allowed to fire them for. There's a baseline of knowledge there, and so of course, there's going to be sufficient evidence. If you take that and put it together with pretext, that's going to support a fair, reasonable inference. But in this case, there was no knowledge, and so there's no retaliation case that I'm aware of where there's no evidence of knowledge, no independent evidence that the decision maker actually knew of protected activity, where then the sort of disbelieving the employer's reason is found to be sufficient evidence to support an inference of retaliatory motive. There's just not such a case. Now, that's as a matter of law, I think, clear and enough for us to win. Now, you might say there could be some case where there's just, it's so inexplicable of why they fired a person that it's not even, there's no other conceivable reason. I think the case law doesn't support that type of decision, but even if you were to say that that might be the case, that there could be such an inexplicable instance of termination, that's clearly not the case here, because as I mentioned, the decision was made to investigate Mr. Kingston, the recommendations were made to investigate Mr. Kingston, all before any protected activity was known about. And so as a result of that, we think this is not that type of case. So if I could for just one minute before I sit down and reserve my rebuttal time, I would like to address the remitter issue, which is the $6 million non-economic damages award, which more than likely is the already massive $5 million compensatory damages award. As we lay out in our briefs, that is just several times grossly excessive to what any similar type of garden variety case you will ever see on a type of non-economic damages award. The only real answer on the other side is that the ratio to economic damages supports that. We don't think that's a valid basis to support the award, because in effect what that would do is give preference to high income earners as plaintiffs, instead of the blue collar workers in all the cases we cite, where the highest award of anything even resembling this, and I would say actually much worse discrimination, much worse suffering, the high end of those awards tends to be around $875,000. Again, we think that would be high even for this case, because the suffering in those cases was much worse. So what do you, suppose that we agree with you that the award was excessive, what do you want us to do? Do you have a number in mind? So I was thinking about this last night and did look, there's a case in 2007, a freight liner bound on the remand in the remitter process, typically what you do is you send it back and you tell the district court, offer this amount for remitter, or give the plaintiff the option for a new trial. So there is a precedent, this freight liner case from 2007, where you could say here's the upper bound for what we think it would be, it's up to the district court's discretion to say what the remitter would be within that, and here we think because that $875,000 number is the upper bound based on the cases we cite in our briefs, that would be at the very least what would be the appropriate amount. With that, I'll reserve the remainder of my time for both. Thank you. All right. We'll hear from the other side. May it please the court, my name is Mark Sigmund and I represent the Eppley Scott Kingston, and I am happy to get into the weeds about the evidence at trial in this case, but first, I just wanted to highlight two quick points. First, Kingston's burden at trial was only to show that his complaints about Beard were a substantial motivating factor in his firing, not that it was the only factor or even the only factor that this court should affirm unless it concludes that no reasonable juror on this actual jury could have and should have found for Mr. Kingston, or if it concludes that Judge Peckman somehow abused her substantial discretion in running this trial. In truth, this was a well-run two-week trial, and this court should affirm. Turning first to the evidence of knowledge, Judge Miller, let me just address pretext first because I think it's almost the easier argument here. Opposing counsel said that no court has applied Reeves to retaliation. We cited the Wren's case. The Washington Court of Appeals applied Reeves to a retaliation claim. Reeves clearly holds that evidence of pretext goes to the motivation of the employer. That's synonymous with the purpose behind an employer's actions. That is synonymous with knowledge and motivation, and I want to point out something even more critical here. IBM's own argument in its brief actually perfectly highlights why evidence of pretext is relevant to knowledge and motivation. Specifically, they hypothesize an innocent reason why maybe that email was forwarded, and they say maybe they forwarded that email because they were trying to see how Kingston reacted to the Beard situation to gauge his culpability for not capping Mr. Donato. But of course, that assumes that Mr. Kingston could have capped either one of them consistent with their policies, and so we have all this evidence that directly refutes that. By the way, that argument appears in the very knowledge and motivation section of their opening brief and 14 of their reply. They raise this argument. Our evidence of pretext directly refutes that, and so I don't understand how IBM can now come here and say that the evidence of pretext is entirely irrelevant to the issue of knowledge and motivation. Frankly, I think that if this Court agrees that evidence of pretext is relevant to knowledge and motivation per Reeves, then this becomes a relatively easy case because the evidence of pretext here was overwhelming, and they don't even really attempt to argue to the contrary. But we are not relying only on pretext. So about the actual evidence itself, we have more than the email, by the way. For example, there's a policy that requires that if someone complains to an IBM manager about either race discrimination or capping, that that manager has to report that up the line. Well, Mr. Kingston testified that he complained to at least four people about that, and a reasonable juror could find that the people he complained to, including his immediate supervisors, Mitchell and Copeland, then reported that up the line. So that's evidence. Furthermore, look at how Mr. Kingston himself reacted immediately upon being fired in this case. He got a call from Dorothy Clopin saying, you're fired. What did he bring up? He immediately brought up Beard. That's the first thing he did. He followed up on an email about Beard, and he told them, how are you firing me for what I did about Beard? I was just following policy. I think a reasonable juror could look at Mr. Kingston's reaction and say, yeah, I mean, that guy was acting reasonably when he thought that that was what it was about. And then, of course, there's the email, which we don't want to run away from at all, contrary to what they claim. This email is wonderful evidence. Think about this. That email was sent right in the middle of the investigation about Donato, but it's about nothing but Beard. A reasonable juror could find that, based on that email, that Mr. Kingston's complaints about Mr. Beard were relayed to the decision makers. In fact, again, going back to IBM's offered hypothetical reason about why that email may have been forwarded when it did, their own reason implies that IBM was talking about these two deals at the same time. Their own reason, pages 40 and 14 of their reply, hypothesizes that they were discussing the Donato and Beard at the same time. But the email is, well, it's not evidence of a complaint of race discrimination at all, and it's only pretty weak evidence of any sort of complaint, right? The email is saying he was unhappy, but it doesn't even convey the sense that he complained particularly vigorously. So what can we do with that? Well, certainly, Your Honor. And to be clear, the email itself was not even written by Mr. Kingston. So the email itself is not an actual complaint. It is evidence of complaints. And the complaints he made are the ones he testified about, where he complained to everyone under the sun immediately afterwards for four months that this is not right. Right. But I guess if you're using the, if you're trying to use the email as evidence that the relevant decision makers were aware of his complaints, the email does not really describe a complaint, does it? I think a reasonable juror could look at the text of the email and realize that Mr. Kingston was not happy with what was going on. Now, is it, you know, would that email by itself were the only piece of evidence? Would that be a vociferous enough complaint? Possibly not. But that's not this case. But I'm not, I don't mean to quibble with Your Honor's question. I understand the question. My point is that that evidence, that email, I think is perfectly good circumstantial evidence to show that the actual complaints that Mr. Kingston did make were being discussed. That's why the email was forwarded in the middle of this investigatory process when it had nothing to do, supposedly, with the Donato situation. And again, I want to highlight IBM's own argument in its brief here, because their own argument suggests that that email was forwarded because they were discussing these things at the same time. And I think once you get to that point, once you sort of concede that IBM's decision makers were looking at these things together, then the only other inferential step you need to make is that they were considering the fact that Mr. Kingston had some complaints about what was going on here. But it has to be protected activity, right? So obviously, in both those situations, there was a very high commission that Mr. Kingston had not mediated in any way. So obviously, those situations were similar, but that's not enough to show that he opposed racial discrimination, which is what would need to be shown. So what's the evidence for that, not just that the two situations were analogous because of the high commission issue? First, to be clear, it's not just racial discrimination. There was two co-equal retaliation claims here. One is he's opposing race discrimination. One is he's opposing the wrongful capping of wages. And frankly, that claim was added later in the case upon significant briefing, and so that was a lie. Can I just ask a question of Washington law? So wage theft, or I forgot what the language was, withholding of earned wages, does that cover commissions? Is there a Washington statute that explains that commissions are part of earned wages? There is, Your Honor, and that was subject to a lot of briefing below, but that's not on appeal here. But what actually happened was the court granted a summary judgment, and going up to trial, there was only the race discrimination claim. And Judge Peckman, in a very thorough decision upon lots of briefing, realized that there was actually a separate retaliation claim for violation of earned wages because commissions are earned wages under Washington statutory law. And that's the claim that ultimately was added before trial, which is why there's two different bases at trial. And that's the claim, frankly, that's at issue in all the other cases we cited in our brief, which, full disclosure, my co-counsel and I have been involved with. Those are cases that were involved with these other state statutes that protect commissions. And I think every wage in our statute, I know, protects commissions as well, as long as they're earned. They can't be purely discretionary, but as long as it's an earned commission. And the basis for a claim like here has always been that you've said crystal clear you can't cap. They said it a thousand times. And then they define capping as don't take into account contribution. It's just, it's pure math. And then these commissions come, and they don't follow that. And what Mr. Kingston did in this case was he followed IBM's policy. And he said, you know, I'm not going to allow that. And now IBM is coming. And, you know, Your Honor asked a question, what was the reason for the firing? And you said, was it because you capped? And opposing counsel said, they still can't admit it. They say, well, it's not because he capped, it's because he, like, didn't, no. Like, what they, what they said he should have done to Mr. Donato was a cap in violation of his policy. I think they've implicitly admitted that in the brief, and I don't think they can get around that now. I'm sort of surprised that there's not evidence from depositions here of showing some more direct link to the decision makers. I mean, why wasn't there some, did you take the depositions of some of the supervisors of Kingston who did know of his complaint about whether they did or did not talk to a decision maker or from a decision maker who says, yeah, they did tell me about his, Kingston's race discrimination arguments. I mean, I don't see any direct proof of that. Why is there not from testimony? Well, yeah, Your Honor, I mean, as the courts have held in most of these cases, you rely on circumstantial evidence because there's not a direct link or because the people that might know are going to deny it. And if you look at the testimony, some of them said, I was not considering anything about Mr. Beard. Others sort of equivocated about it, which is why you need to rely on things like the email. But yes, I mean, Your Honor, I agree that, you know, I would have, I was not trial counsel, but it would have been an even, I think it was, I think it was, we had a great case, but it would have been even greater if the decision makers had just said, yes, we had lawfully considered this capping issue. They didn't. That's why we relied on circumstantial evidence. And that's why the jury found for us. And that's why I just don't think you can meet that high standard of review to reverse that jury verdict here. I'm happy to keep going on that issue. We have not talked yet about the jury instructions. I don't want to belabor that if the court has no big questions about that. I only want to point out their first argument is on plain error. They have not conceded that. They haven't really addressed plain error. There was no error at all here. First off, I mean, the instructions follow the pattern instructions almost to a T with helpful clarifications. But they don't even argue that there is a substantial right affected, much less a miscarriage of justice. Get to the economic harm or non-economic harm, the six million. Sure. You know, I have laid out, I think, as I think both sides have laid out as much as you can do in the briefs on that. And I'm happy to answer any questions. The thing that I would highlight is, you know, Judge Peckman instructed the jury to pay attention to things that you can only see at trial, right, that don't appear on the page on the cold record here, how the witnesses appear, their demeanor. They saw Mr. Kingston and his wife testify. And it doesn't make it onto the page. Mr. Kingston broke down during his testimony. They saw how emotionally damaged he was. I mean, you know, that's why we have an abuse of discretion for damages like that is because what I mean, I don't want to, I certainly don't want to trivialize the harm that would be caused by getting fired from your job. But that by definition, that is true of every plaintiff in a wrongful termination case. So what? I apologize for the interruption. It was an emergency order that my vote was needed on an emergency basis. But we're all taken care of now. So you may continue. And I think the question was, you know, what is it that takes this sort of out of the outside of what you would expect in any wrongful termination case? Sure. And so, I mean, again, it's abuse of discretion for, you know, for a reason. And as Judge Pickman noted, she did not find this to be garden variety damages at all. IBM argued that and she rejected that principle. Scott Kingston's wife basically said that he was going to kill himself. That's, you know, that's one fact. But he didn't say that, right? True. And there was no psychiatric testimony or evidence of any sort of psychiatric treatment, right? That's correct. You know, Mr. Kingston is of a certain age. I think he was not the kind of person to go get psychiatric treatment of any sort. But that is correct. You know, he also, you know, he was 58 years old when he was fired. And he applied for over 200 jobs in the software industry. I mean, 200 jobs, that's a lot of applications. That's, you know, an incredible amount of stress there. And of course, then, you know, as Judge Pickman pointed out, IBM didn't give its own number. And the jury did not award as much as requested. And, you know, when you look at some of these cases with astronomical awards, it's the jury sometimes gives more than you request. I mean, the fact that we requested, I think it was 8 million here, and the jury gave less than that, I think is significant. And finally, you know, opposing counsel says that we rely only on the ratio. That's not true at all. I rely on all the evidence that's in the brief and the two facts I just mentioned. But the ratio does matter, only because there's one Washington court that even mentioned that ratio when affirming the verdict of one point, whatever the ratio was. And the ratio here is 1.18 to 1. I just don't think that on this case, on these facts, this is just not an abuse of discretion. I mean, I have the question, you know, suggested by your opponent's argument. I mean, it doesn't relying on the ratio just reward people who, I mean, are higher-income workers, you know, more emotionally fragile, that they suffer greater distress than low-income workers. 100%, which is why I'm not relying only on the ratio. That's why it's seasoning and spice and not the main dish. 100%, I agree with that. I think that if that's all we had here and there was no evidence of, you know, just the things that we cited in the brief, I think there might be a problem. But, you know, given the abuse of discretion standard and where we are and that ratio just being there as a subsidiary factor, I just don't see how it's an abuse of discretion. But, Your Honor, I agree with your point. I see the point there. I am happy to answer any other questions about the record. I've, I was not trial counsel, but I've, you know, read this record many times and can answer questions. Otherwise, I will rest on my briefs. All right. I think we have your argument. Thank you. Thank you, Your Honor. Just to address a few points in order. The first on the pretext point with the Wren's case. As we explain on page 18 of our reply brief, in the Wren's case, there actually was independent evidence of knowledge on the part of the decision maker because the decision maker, quote, overheard the plaintiff's complaint.  there is no such case that the other side can cite or that we can find where there's finding of sufficient evidence of knowledge based solely on some separate evidence of pretext without independent evidence that the person or the decision maker actually had knowledge. Wren's is not such a case because there was independent evidence of knowledge there. On the second point with the timing of the email, my friend on the other side says you can infer from the timing of the email that they were talking about opposition activity. But, of course, that would only be true if the email had some evidence of opposition activity in it. But since the email doesn't mention wage theft or discrimination, you can only infer from the email that they were talking about what the email says. If you want to infer that there's something outside of that, you have to look at evidence beyond the email. And here there was no such evidence. So the fact that you can hypothesize, well, they may have considered this or they may have considered that, that's necessarily speculation. What takes it out of the bounds of reasonable inference is that there's no actual evidentiary grounding in what the content of the email was or some other evidence outside of the email. So, I mean, the email doesn't say anything about race, but it doesn't use the words wage theft. But isn't it reasonable to, or at least a permissible inference from this, the reference to changing the rules of football in the middle of the game is essentially a way of saying, like, his claim is they earned this and now it's being taken away. Well, I think at the very least, the outer bound of the inference that could be made is that this person may have thought it was unfair, but remember what protected opposition activity actually requires. It requires more than saying, hey, I think this is unfair, but I'm okay with it. Right? I mean, this is set up, the law is set up to require actual forceful opposition. And so you would need to say from this email, which says, well, the guy thinks it's kind of unfair, but he's okay with it. He gets it. He understands one and a half million dollars is a lot for a commission on which he didn't do much work. That is very far from the type of forceful opposition that you would need to show to sustain a retaliation claim. So I don't think that that would get you there. You would need some other evidence. As Your Honor pointed out, it's really amazing that there's no evidence from any other source, any of the decision makers involved who would say this. Everybody who was asked said the decision makers didn't know. So I don't think you can rely on the email to get where you need to go. The other thing that my opponent pointed out was the policy requiring reporting, which we addressed in our reply brief. Mr. Kingston's counsel at trial themselves said there was no report, and they complained about that. And of course, the policy did not require reporting to the decision makers. It required reporting up the chain. But given that it didn't require reporting to the people who actually made the decision to terminate Mr. Kingston, that is not itself evidence that's sufficient to sustain. Judge, where do you think the district judge went wrong? Because obviously the district judge disagrees with you. Right. I think the district judge simply did not look carefully enough at the email. As we say, if you look at the excerpts of record pages five and six, the district judge essentially took for granted that the email showed opposition activity and said, this email shows complaints that were sufficient to sustain. So the district judge, I think, really was relying on an account of that email that is not reflected in what the email said. And I think that was the district judge's chief mistake on which this court should reverse. The only other thing that my friend mentioned that was new was Mr. Kingston's reaction upon hearing the news that he had been terminated. But that doesn't go to the question of whether any decision maker had known about it. Because Mr. Kingston didn't say, oh, I had told the decision makers this. Of course, Mr. Kingston says he told some other non-decision makers about it. But his reaction after the fact is simply not evidence of what the decision makers knew. And that's not enough to sustain the verdict either. So the last thing I will say is on the remitter point. I do think this is a garden variety case. And remember, the $5 million Economic Damages Award already fully compensated Mr. Kingston for every cent he would have earned if he had continued working until age 67, except he wasn't actually going to be required to do the work because he didn't have the job anymore. So on top of that, the $6 million of extreme emotional harm I don't think is sustainable. I think it's far outside of the mainstream. And it cannot stand. Thank you very much, Yash. All right. I thank both sides for their argument in the case of Scott Kingston versus IBM. Is submitted and we're adjourned for this session.
judges: Gilman, IKUTA, MILLER